United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| John Agudelo and Yellow Project Management, Inc., Plaintiffs, | ) ) ) | |
| v. | ) | Civil Action No. 18-22612-Civ-Scola |
| Jose M. Padron, Defendant. | ) ) ) | |

**Order on Defendant's Motion for Summary Judgment**

Plaintiffs John Agudelo and Yellow Project Management, Inc. bring this suit for breach of fiduciary duty, unjust enrichment, and fraud against Defendant Jose M. Padron in relation to a 2012 real estate transaction. The Defendant now moves for summary judgment on all counts of the Plaintiffs' Amended Complaint. (ECF No. 53.) For the reasons discussed below, the Court **denies the** Defendant's motion for summary judgment. **(ECF No. 53**.)

## I. Background

Plaintiff Agudelo and Defendant Padron are from Venezuela. That is about all they can agree on in this case. After a careful review of the parties' depositions, the Court will summarize the facts as presented by the parties.

According to the Plaintiff, he and the Defendant met at a social gathering at a mutual friend's home in Venezuela. (Agudelo Deposition Transcript, 14:4-11, ECF No. 51-1.) The Plaintiff testified that this occurred in approximately 2013 or 2014 (*id.* at 14:2-4) but the complaint alleges that this meeting occurred in 2011. (ECF No. 37 at ¶ 10.) The mutual friend is Eugen Sader Bejarano.[1] Sader Bejarano told the Plaintiff that the Defendant and/or his father were real estate agents in Florida. (ECF No. 51-1 at 17:23-18:3.) The Plaintiff wanted to purchase an investment property in Miami so he "solicited Mr. Padron's counsel." (*Id.* at 18:10-12.) According to the Plaintiff's testimony, he called Padron and they had a conversation about the investment and Padron "agreed to look for different options and started sending them to [Agudelo] via email." (*Id.* at 19:12-15.) Agudelo testified that since Padron's father was the one with the real estate business in Florida, "he [was] the one doing the proceedings." (*Id.* at 20:4-6.)

---

[1] Sader Bejarano has also sued Defendant Padron in a related case pending before Judge Rodney Smith. *Eugen Bejarano Sader v. Jose M. Padron*, Case No. 18-cv-22891 (S.D. Fla.). Sader Bajarano is the son of the former Minister of Health of Venezuela.

Padron's father, also named Jose M. Padron ("Padron Senior"), is a Re/Max agent. (*Id.* at 36:12-17.)

The Defendant recommended that the Plaintiff incorporate a Florida LLC to purchase the property. (ECF No. 55-1 at ¶ 15.) Padron would serve as the manager of the Florida LLC and manage the property on Agudelo's behalf. (*Id.* at ¶ 16.) The Florida LLC, Yellow Project Management, is not a party in this case. Padron hired attorney Dennis Ponn to facilitate the purchase and closing of the property. (*Id.* at ¶ 13.) Agudelo signed a Closing Authorization authorizing Padron, as the manager of the Florida LLC, to "approve and sign all closing documents, including the closing statement, on behalf of the [Florida LLC]." (ECF No. 55-1 at Exhibit C.) Agudelo wired the purchase price of $1.6 million to attorney Ponn's escrow account and the Florida LLC purchased Unit 4104 at the Jade in Miami Beach. (ECF No. 55-1 at ¶14.) The funds were wired from a company owned by Agudelo: Yellow Project Management, Inc., a British Virgin Islands company, also a Plaintiff in this case. (ECF No. 51-1 at 33:9-22.) Yellow Project Management, Inc. is a company that consults for Chinese companies doing infrastructure projects for the Venezuelan government. [2] According to Agudelo's testimony, the Venezuelan government pays the Chinese in oil and the Chinese pay their contractors and consultants in dollars. (*Id.* at 51:22-52:15; 132:7-11.) Agudelo is the sole shareholder of the BVI company. (*Id.* at 33:15-22.)

After the apartment was purchased, it is unclear who was paying the maintenance expenses and taxes. Agudelo testified that "[a]ll that was being done by Padron." (*Id.* at 55:22-23.) He also testified that "I know Mr. Padron paid them. And I also know that, in good part, he was given the money to pay that." (*Id.* at 57:22-25.) When asked who would have given Padron the money, Agudelo responded, Eugen Sader Bajarano. (*Id.* at 58:1-2.) According to Agudelo, Sader Bajarano was living in the apartment for about two to three years. (*Id.* at 58:15-16.) Agudelo never lived in the apartment. (*Id.* at 59:10-12.)

According to the Plaintiff's Statement of Undisputed Facts, in December 2017, "Padron Jr. transferred titled to the property from [the Florida LLC] to himself, individually, and shortly thereafter transferred the property to Valizas Corporation." (ECF No. 55 at ¶ 58.) Agudelo never received proceeds from the sale of the property. (*Id.*) When asked about this, Agudelo testified that he went to Padron's office in Miami in February 2018 "to see what happened with that sale that was done without my knowledge whatsoever." (ECF No. 51-5 at 64:12-16.) But when asked if he "fl[ew] into Miami, specifically, to meet with Mr. Padron," Agudelo responded, "No." (*Id.* at 9-11.)

---

[2] Agudelo testified that he named it "yellow" project management because it was managing projects for the Chinese. (ECF No. 51-1 at 54:20-55:2.)

During this meeting, Agudelo told Padron that Sader Bejarano needed money and he (Agudelo) had come to speak to him on behalf of Sader Bejarano. (*Id.* at 66:6-11.) Agudelo also asked Padron about the apartment:

> Q: And you never asked anything about the Jade apartment, when you were in the meeting with Mr. Padron at JM Honda, did you?
> 
> A: Of course. I asked him. I asked him, what happened with that; and I asked him, why it was done that way and what they were going to do with that money.
> 
> Q: Who is the "they" you are talking about?
> 
> A: What he was going to do with that money, because that property was sold. And why weren't those monies returned to Yellow.
> 
> . . .
> 
> Q: And what did he say to you?
> 
> A: That he had to fix personal accounts; that he had several problems with his finances and with taxes and that he needed time to resolve them. We started talking, regarding how much time he needed to solve that situation. And then, after that, the conversation was finished.

(ECF No. 51-1 at 67:8-68:7.) Agudelo visited the Defendant a second time to pick up a power of attorney for an apartment in Caracas, Venezuela that he was instructed to give Bejarano Sader. (*Id.* at 74:9-75:12.)

> Q: It is your understanding that there was a business deal between Mr. Padron and Mr. Eugen, for Mr. Padron to sell him the apartment in Caracas and, therefore, Mr. Sader needed to complete the deal with a Power of Attorney to transfer the title in Caracas.
> 
> A: That is as far as I know.

(*Id.* at 74:25-75:7.) Agudelo sued Padron in June of 2018 based on Padron's sale of Agudelo's apartment without Agudelo's knowledge. (ECF No. 1.)

According to Padron's testimony, he never spoke to Agudelo about the apartment nor did he help Agudelo purchase the apartment. Padron testified that he and Agudelo met in an office in Plaza Venezuela in 2011. (Padron Deposition Transcript, Vol. I, 10:17-11:6, ECF No. 52-1.) There was no one else in the office. (*Id.* at 11:10.) He was introduced to Agudelo via email or phone and told to meet him at this office. (*Id.* at 11:11-13.) Padron was told that Agudelo

worked for the Ministry of Health under Eugen Bajarano Sader and they were in need of some emergency equipment and ambulances. (*Id.* at 11:22-12:18.) They did not communicate again until Padron "was instructed to send him the wire transfer information." (*Id.* at 15:12-15.) Padron testified that Sader Bajarano told him to send the wire instructions to Agudelo (*id.* at 23:5-7) because Agudelo was sending this payment to satisfy a debt owed by the Ministry of Health. (*Id.* at 15-18.) According to Padron, the ultimate beneficiary of the payment was a company called Inversiones Isgure. (*Id.* at 18:13.) The wire was sent to the escrow account of attorney Dennis Ponn. (*Id.* at 18:23-24.) Inversiones Isgure is owned by Eduardo Cartaya, Padron's father in law. (Padron Deposition Transcript, Vol. II, 8:9-11, ECF No. 52-2.)

> Q: If I understand your testimony, sir, the Ministry of Health owed some money to Inversiones Isgure, correct?
>
> A: Correct.
>
> Q. And the mechanism to make that payment was a BVI corporation was going to send money to an escrow account of Mr. Dennis Ponn in Miami, Florida, correct?
>
> A. I didn't know it was a BVI corporation, so you're the one saying it . . . At that moment I didn't know.
>
> Q. You just knew some money was coming from somewhere?
>
> A. Correct.

With that money, Padron purchased the apartment and retained control of the apartment because he had a loan with Inversiones Isgure. (*Id.* at 35:16-20.)

> Q. So if I understand your testimony, the money that was sent to purchase the apartment was sent on behalf of the, as you allege, the Ministry of Health.
>
> A. Correct.
>
> Q. Was a loan Inversiones Isgure made to you?
>
> A. Correct
>
> Q. And you used the proceeds of that loan to purchase an apartment?
>
> A. Correct.

(*Id.* at 26:6-16.) According to Padron, he incorporated and is the owner of Yellow Project Management, LLC. (*Id.* at 29 at 7-9.) He cannot recall how he chose this name. (*Id.* at 29:17-21.) Padron testified that he "took control of the apartment, because I was the owner of the LLC" but because it was Inversiones Isgure's

money, "I owed that money to Isgure." (*Id.* at 38:7-10.) Padron also testified that he never discussed anything related to the apartment with Agudelo prior to 2018. (*Id.* at 40:14-17.)

When asked about their meeting in 2018, Padron testified that Agudelo visited him to pick up a power of attorney to an apartment in Venezuela. (ECF No. 52-2 at 6:22-7:21.) According to Padron, Eduardo Cartaya, Padron's father-in-law was granting a power of attorney for an apartment in Caracas to Bejarano Sader in exchange for an apartment in Miami. (*Id.* at 10:6-16.) When asked about the relevance of the apartment swap to this case, Padron stated that "this is the reason why Agudelo went to visit me and not to request what he later claimed, that it was his [ ] apartment in [the Jade]." (*Id.* at 11:17-21.)

## II. <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. North Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), and it may not weigh conflicting evidence to resolve disputed factual issues, *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007). Yet, where the record could not lead a rational trier of fact to find in the nonmovant's favor, there is no genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Generally, "[o]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (citation omitted). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [ ] must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).

## III. <u>Analysis</u>

### A. Count I: Breach of Fiduciary Duty

Based on the vastly different accounts of what occurred here, it is difficult for the Court to even evaluate the Defendant's motion for summary judgment. The Defendant first moves for summary judgment on the Plaintiff's count for breach of fiduciary duty arguing that there is no evidence that the Defendant owed the Plaintiff a fiduciary duty. (ECF No. 54 at 9-10.) The Plaintiff responds

by arguing that an implied fiduciary relationship exists where there is a relationship of trust and confidence existing between the parties. (ECF No. 56 at 3.)

"Under Florida law, an implied fiduciary relationship exists when there is a relationship of trust and confidence existing between the parties, such as 'where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused.'" *In re Basil St. Partners, LLC*, No. 9:11-BK-19510-FMD, 2012 WL 6101914, at *22 (Bankr. M.D. Fla. Dec. 7, 2012). *See also Parker v. ASAP Plumbing of Gainesville, Inc.*, No. 08-cv-000024-MP-AK, 2009 WL 10674131, at *2 (N.D. Fla. Dec. 16, 2009). Moreover, because of the "fact-specific inquiry that must be undertaken to analyze whether an implied fiduciary relationship exists . . . courts will often need to assess the credibility of the parties involved. Thus, the determination of whether such a relationship exists may not be well-suited for summary judgment." *In re Basil St. Partners.*, 2012 WL 6101914 at *23.

Here, the Defendant argues that he never spoke to Agudelo about the apartment and Agudelo was represented by the Defendant's father as his real estate agent and Mr. Ponn as his attorney. (ECF No. 53 at 11.) The Plaintiff's evidence, however, indicates that the Defendant helped Agudelo look for apartments in Miami, gave him wiring instructions to coordinate the purchase of the property, and agreed to be the manager of Yellow Project Management, LLC to help maintain the property on Agudelo's behalf. (ECF No. 51-1 at 19:12-15; ECF No. 55-1 at ¶¶ 14, 16-20.) The Plaintiff also signed a Closing Authorization authorizing the Defendant to sign all closing documents on his behalf. (ECF No. 55-1 at Exhibit D.) Therefore, the Court finds that there are genuine disputes of material fact regarding whether the parties formed an implied fiduciary relationship. Summary judgment as to Count I is denied.

### B. Count II: Unjust Enrichment

The Defendant moves for summary judgment on Plaintiffs' claim for unjust enrichment arguing that the money that was transferred into Ponn's escrow account belonged to Yellow Project Management, Inc., not to Agudelo. (ECF No. 53 at 13.) Therefore, Agudelo does not have a claim for unjust enrichment. (*Id.* at 14.) The Plaintiffs agree with the Defendant. "The Plaintiffs do not dispute that the funds used to purchase the Property were sent from an account owned by [Yellow Project Management, Inc.]. Therefore, Plaintiff Agudelo does not dispute that he does not have a claim for unjust enrichment, and a claim for unjust enrichment against the Defendant should be maintained and pursued by Plaintiff [Yellow Project Management, Inc.]." (ECF No 56 at 6.) Therefore, summary judgment as to Count II is denied as moot. Count II is a claim for

unjust enrichment by Plaintiff Yellow Project Management against the Defendant.

### C. Count III: Fraudulent Misrepresentation

The Defendant argues that Count III for fraudulent misrepresentation should be dismissed because it fails to meet the heightened pleading requirement of Rule 9(b). (EFC No. 53 at 14.) According to the Defendant, "Plaintiff has not testified to any particulars, no precise statements; Plaintiff has not produced any documents authored by the Defendant (not even one email or text message) in support and has not provided the content and manner in which Defendant's statements and actions were misleading[.]" (*Id.* at ¶ 16.) According to the Defendant, he never spoke to Agudelo about the property. According to Agudelo, based on Padron's representations, he wired money to an escrow account for the purchase of the property, agreed to incorporate the Florida limited liability company to take title to the property, and authorized Padron to sign the closing documents as the manager of Yellow Project Management, LLC. (ECF No. 55-1 at ¶ 17.)

To state a cause of action for fraudulent misrepresentation, a plaintiff must prove: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation." *Coquina Investments v. Rothstein*, No. 10-60786-CIV, 2011 WL 4971923, at *13 (S.D. Fla. Oct. 19, 2011) (Cooke, J.).

There are a number of issues of material fact with respect to the elements of Agudelo's fraudulent misrepresentation claim. For example, Padron claims he instructed Agudelo to wire the money because he was following the directions of Bejarano Sader and the money was intended to satisfy a debt owed by the Venezuelan government to Inversiones Isgure. (ECF No. 52-1 at 73:7-17.) On the other hand, Agudelo believed he was sending the money, pursuant to Padron's instructions, to purchase an investment property that Padron would help manage. (ECF No. 55-1 at 3.) "Whether [Padron] made false statements to [Agudelo], knew his statements to [Agudelo] were false, and whether [Agudelo] relied on those statements are questions of fact for the jury." *Coquina*, 2011 WL 4971923 at *13. Accordingly, the Court denies summary judgment on Count III.

### D. Count IV: Fraudulent Concealment

The Defendant moves for summary judgment as to Count IV for fraudulent concealment arguing that fraudulent concealment requires that one party have a duty to disclose information to the other party. (ECF No. 53 at 17.) Similar to

his argument regarding breach of fiduciary duty, the Defendant asserts that because he owed no duty to the Plaintiff, there can be no claim for fraudulent concealment. (*Id.* at 18.)

As discussed above, the Court finds that there is still an issue of fact as to whether the Defendant owed a duty to the Plaintiff. With regard to a duty to disclose, if a jury were to find that the parties formed a fiduciary relationship, then the Defendant likely had a duty to disclose to the Plaintiff that he was planning to sell, and later sold, the apartment. *See State v. Mark Marks, P.A.*, 654 So. 2d 1184 (Fla. 4th DCA 1995) ("A fraud is committed for the failure to disclose material information only when there is a duty to disclose such; and such duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them."). Accordingly, summary judgment is denied as to Count IV.

## IV. Conclusion

The parties' testimony is so vastly divergent in this case that the Court feels compelled to remind counsel of their duty of candor to the court. "All attorneys, as officers of the court, owe duties of complete candor and primary loyalty to the court before which they practice. An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly." *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1546 (11th Cir. 1993).

Based on the foregoing, the Court **denies** the Defendant's motion for summary judgment. (**ECF No. 53**.)

**Done and ordered** at Miami, Florida, on August 14, 2019.

_____
Robert N. Scola, Jr.
United States District Judge